UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| CHRISTOPHER WEAVER,<br><br>                         Plaintiff,<br><br>        v.<br><br>STEVEN MENARD, REBEKAH HAGGARD, and RONA SIEGERT,<br><br>                         Defendants. | Case No. 1:18-cv-00441-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

Plaintiff Christopher Weaver, a prisoner in the custody of the Idaho Department of Correction ("IDOC") and incarcerated at the Idaho State Correctional Institution ("ISCI"), is proceeding pro se in this civil rights matter.

Plaintiff filed this action on October 4, 2018, asserting that he suffers chronic pain in his shoulder, hip, and upper left leg. Plaintiff claims that two medical providers working for Corizon—the private company providing Idaho inmates with medical care under contract with the IDOC—failed to provide him with adequate medical treatment for his chronic pain from April to October 2018.[1] These Defendants, Dr. Rebekah Haggard and Dr. Steven Menard, will be referred to collectively as the "Corizon Defendants." Plaintiff also claims that Defendant Rona Siegert, the Health Services

---

[1] Initially, it appeared that Plaintiff was also asserting claims of inadequate medical care with respect to the non-pain-related treatment he received for his underlying injuries. However, Plaintiff has clarified that he is challenging as unconstitutional only the treatment he received for the pain he suffers because of those injuries—not "with respect to surgical or other curative treatment for his shoulder or hip/femur injuries" themselves. *See Resp. in Opp.*, Dkt. 41, at 1–2.

Director for the IDOC, knew of Plaintiff's allegedly inadequate pain treatment yet denied

Plaintiff's administrative grievance challenging that treatment. Plaintiff asserts that

Defendants' course of treatment during this six-month period violated the Eighth

Amendment to the United States Constitution.

The Court previously reviewed the Complaint pursuant to 28 U.S.C. §§ 1915 and

1915A. Based on the following allegations, the Court concluded that the Complaint stated

plausible Eighth Amendment claims of inadequate medical treatment against Defendants

Haggard, Menard, and Siegert:

> In this case, Plaintiff has sufficiently alleged that he is suffering from several different serious medical conditions that cause him pain and suffering. He has also alleged that Dr. Steven Menard and Dr. Rebekah Haggard are aware of his serious medical condition but have not provided adequate treatment. Nurse Rona Siegert oversees the provision of medical care for the Idaho Department of Correction, and allegedly approved the denial of treatment, despite Plaintiff informing her of his ongoing pain and suffering.
>
> Plaintiff also complains that, after he was placed in segregation for having another inmate's prescription medication in his possession, Dr. Menard and Dr. Haggard reduced Plaintiff's pain medication prescription as a sanction and because of the general policy that the use of opiate pain therapy is discouraged by the federal government, and not as a reasonable medical decision based on the circumstances and their medical training. Plaintiff also alleges that, even though he is being given three daily dosages of morphine and one dosage of Neurontin, his pain levels are still between an 8 to 10.
>
> The Court will permit Plaintiff to proceed on Eighth Amendment claims against Menard, Haggard, and Siegert. This Order does not guarantee that Plaintiff's claim will be successful. Rather, it merely finds that Plaintiff's claim is plausible—meaning that this claim will not be summarily

MEMORANDUM DECISION AND ORDER - 2

dismissed at this time but should proceed to the next stage of
litigation.

*Initial Review Order*, Dkt. 6, at 6–7 (April 15, 2019). The Court dismissed all of
Plaintiff's other claims. *Id*. at 10.

The Corizon Defendants and Defendant Siegert have filed Motions for Summary
Judgment, which are now ripe for adjudication. *See* Dkt. 36, 38. The Court finds that the
facts and legal arguments are adequately presented in the briefs and record and that oral
argument on the Motions is unnecessary. *See* D. Idaho Loc. Civ. R. 7.1.

Taking the facts in the light most favorable to Plaintiff, the Court concludes
Plaintiff cannot establish deliberate indifference to his serious medical needs in violation
of the Eighth Amendment. Accordingly, the Court enters the following Order granting
Defendants' Motions.

## SUMMARY JUDGMENT STANDARD OF LAW

Summary judgment is appropriate where a party can show that, as to any claim or
defense, "there is no genuine dispute as to any material fact and the movant is entitled to
judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the
summary judgment rule "is to isolate and dispose of factually unsupported claims or
defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is not "a disfavored
procedural shortcut," but is instead the "principal tool[] by which factually insufficient
claims or defenses [can] be isolated and prevented from going to trial with the attendant
unwarranted consumption of public and private resources." *Id*. at 327.

In considering a motion for summary judgment, the Court must consider the facts in the light most favorable to the non-moving party, unless the non-moving party's version of those facts is "blatantly contradicted by the record." *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment …." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A case will survive summary judgment only if there is a *genuine* dispute as to a *material* fact. Material facts are those "that might affect the outcome of the suit." *Id.* at 248. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The party moving for summary judgment has the initial burden to show that each material fact cannot be disputed. To show that the material facts are not in dispute, a party may cite to particular parts of materials in the record or show that the adverse party is unable to produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1)(A) & (B). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

If the moving party meets this initial responsibility, then the burden shifts to the non-moving party to establish that a genuine dispute of material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The

existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which [a] jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. The Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (internal quotation marks omitted). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific, triable facts." *So. Ca. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

That is, "if a defendant moving for summary judgment has produced enough evidence to require the plaintiff to go beyond his or her pleadings, the plaintiff must counter by producing evidence of his or her own." *Butler v. San Diego Dist. Attorney's Office*, 370 F.3d 956, 963 (9th Cir. 2004). If the plaintiff fails to produce evidence, or if the evidence produced is insufficient to establish a genuine and material factual dispute, the Court "is not required (or even allowed) to assume the truth of the challenged allegations in the complaint." *Id*.

Material used to support or dispute a fact should be "presented in a form that would be admissible in evidence," or it may be stricken. Fed. R. Civ. P. 56(c)(2). Affidavits or declarations submitted in support of or in opposition to a motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). In determining admissibility for summary judgment purposes, it is the

content of the evidence, rather than its form, that must be considered. *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003).

If a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the Court may consider that fact to be undisputed. Fed. R. Civ. P. 56(e)(2). The Court must grant summary judgment for the moving party "if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3). Where, as here, the party moving for summary judgment would not bear the burden of proof at trial, that party may prevail simply by "pointing out to the district court[] that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325.

The Court does not determine the credibility of affiants or weigh the evidence set forth by the non-moving party. Direct testimony of the non-moving party must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). However, although all reasonable inferences which can be drawn from the evidence must be drawn in the light most favorable to the non-moving party, *T.W. Elec. Serv., Inc.*, 809 F.2d at 630–31, the Court is not required to adopt unreasonable inferences from circumstantial evidence, *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

Statements in a brief, unsupported by evidence in the record, cannot be used to create a genuine dispute of material fact. *Barnes v. Indep. Auto. Dealers*, 64 F.3d 1389, 1396 n.3 (9th Cir. 1995). The Ninth Circuit has "repeatedly held that documents which have not had a proper foundation laid to authenticate them cannot support a motion for summary judgment." *Beyene v. Coleman Sec. Services, Inc.*, 854 F.2d 1179, 1182 (9th

Cir. 1988) (internal quotation marks omitted). Authentication, required by Federal Rule of Evidence 901(a), is not satisfied simply by attaching a document to an affidavit. *Id.* The affidavit must contain "testimony of a witness with personal knowledge of the facts who attests to the identity and due execution of the document." *Id.*

Pro se inmates are exempted "from *strict* compliance with the summary judgment rules," but not "from *all* compliance." *Soto v. Sweetman*, 882 F.3d 865, 872 (9th Cir. 2018). In opposing a motion for summary judgment, a pro se inmate must submit at least "some competent evidence," such as a "declaration, affidavit, [or] authenticated document," to support his allegations or to dispute the moving party's evidence. *Id.* at 873 (upholding grant of summary judgment against pro se inmate where the "only statements supporting [plaintiff's] ... argument are in his unsworn district court responses to the defendants' motion for summary judgment and to the district court's show-cause order").

## FACTUAL BACKGROUND

This section includes facts that are undisputed and material to the resolution of the issues in this case. Where material facts are in dispute, the Court has included Plaintiff's version of facts, insofar as that version is not blatantly contradicted by clear documentary evidence in the record. *See Scott*, 550 U.S. at 380.

## 1.    Plaintiff's Course of Medical Treatment Provided by the Corizon Defendants

Plaintiff is incarcerated on a conviction for possession of a controlled substance. *Corizon Defendants' Stmt. of Facts* ("*Corizon Defs' SOF*"), Dkt. 38-2, ¶ 1; *see also* IDOC Offender Search, https://www.idoc.idaho.gov/content/prisons/offender_search (last

visited Jan. 21, 2021). In August 2014, before Plaintiff was incarcerated, he was involved in a car accident and suffered a separated right shoulder and a neck fracture at the T1 vertebra. *Compl.*, Dkt. 3, ¶ 13.

Plaintiff is partially paralyzed; he can use his shoulders and arms, "but is otherwise mostly unable to move his trunk and legs." *Id.*, ¶ 15. Plaintiff has also lost his lower legs as the result of a MRSA infection. *Corizon Defs' SOF*, ¶ 1. However, Plaintiff can still feel sensation in his chest and lower body and "recently has been regaining the ability to move his legs." *Compl.*, ¶ 15. Plaintiff uses a transferring board to move himself to and from his wheelchair.

As a result of Plaintiff's medical needs, he resides in the long-term care ("LTC") section of the medical building at ISCI. As an LTC patient, Plaintiff "is seen and rounded on by medical nursing staff several times a day." *Decl. of Rebekah Haggard* ("*Haggard Decl.*"), Dkt. 38-6, ¶ 8. Additionally, in LTC "a physician is available daily to assess and treat [Plaintiff,] and he is also seen by a physician on a weekly basis to discuss his overall health, pain, and chronic conditions." *Id.* LTC is similar to an infirmary and, therefore, "accommodates Plaintiff's special medical and disability needs and permits him continuous access to medical staff, including daily assessments of his overall condition, mentality, and pain levels." *Compl.*, ¶ 18.

Plaintiff's medical records state that Plaintiff has a significant history of substance abuse and that he previously overdosed on Methadone. *Haggard Decl.*, ¶ 7; *Ex. A to Decl. of Tonya McMilian* ("*McMilian Decl.*"), Corizon_Weaver 000401, 465, 475. Plaintiff claims that he does not have a history of substance abuse. *Resp. in Opp.*, ¶ 1(a).

It is undisputed, however, that (1) Plaintiff was convicted of possession of a controlled substance, (2) Plaintiff's medical records state that Plaintiff has a significant history of substance abuse and had previously overdosed, (3) Defendants reviewed those medical records, and (4) Defendants believed the information in those records was correct. *Haggard Decl.*, ¶ 7; *Decl. of Steven Menard* ("*Menard Decl.*"), Dkt. 38-7, ¶ 9.

Although Plaintiff's claims involve only his medical treatment from April to October 2018, the Court looks a bit further back in time to gain a better picture of the full course of Plaintiff's medical treatment.

Dr. Haggard began treating Plaintiff indirectly, as the Regional Medical Director for ISCI, in August 2016. She has been treating Plaintiff directly as a treating provider since March 2017. *Haggard Decl.*, ¶ 5.

Dr. Haggard evaluated Plaintiff for shoulder pain on March 28, 2017. Plaintiff informed Dr. Haggard that "he had been on 5mg Norco for several months," that "the pain medication was no longer helping[,] and that he would like to increase his Norco to 10mg." *Id.*, ¶ 9. Dr. Haggard determined that Plaintiff's shoulder pain was caused by "an old partial rotator cuff tear that was aggravated by his increased weight and the transfer burden when moving to and from his wheelchair to his bed." *Id.* Dr. Haggard initially "recommended conservative management to address [Plaintiff's] shoulder pain" because "'surgical intervention would incapacitate [Plaintiff] completely during recovery and [because] [Plaintiff] would be at a risk for [a] worse outcome than [the] present situation if there were complications.'" *Id.* (quoting *Ex. A to McMilian Decl.*, Corizon_Weaver 000086).

Dr. Haggard told Plaintiff that losing some weight would help ease the transfer burden, and Plaintiff agreed. *Id*. Dr. Haggard did not increase Plaintiff's pain medication at that time; she told Plaintiff she would leave the pain management planning to the prison doctor who had been treating Plaintiff's pain, who was "there on a daily basis," because "it is never good continuity to have multiple providers changing orders." *Ex. A to McMilian Decl*., Corizon_Weaver 000086.

Dr. Haggard again evaluated Plaintiff for shoulder pain on April 11, 2017. Plaintiff reported that he was "doing okay," but that his pain was "impairing his ability to exercise and transfer." *Id*., Corizon_Weaver 000076. Dr. Haggard noted in Plaintiff's chart that she would again consult with the other doctor about Plaintiff's pain management and that "[w]e must strike a balance between pain control and overuse of narcotics as this patient will also have complications with his bowels related to the paraplegia." *Id*. It appears that this other doctor stopped treating Plaintiff at some point thereafter, perhaps because of a change in employment.

Dr. Haggard again saw Plaintiff for shoulder pain on April 17, 2017. *Haggard Decl*., ¶ 10. Dr. Haggard noted that, even though Plaintiff stated he was in "uncontrolled pain," he could perform all activities of daily living and regularly went to the gym. *Ex. A to McMilian Decl*., Corizon_Weaver 000071. Dr. Haggard recorded in the medical records that Plaintiff "continues to request specific narcotic drugs and dosages, stating adamantly that these are the only things that control his pain." *Id*. Plaintiff acknowledges that he "discussed the possibility of trying different pain medication" with medical providers, but he states he "never 'demanded' specific pain medications or specific doses

of medication." *Decl. of Christopher Weaver* ("*Plaintiff's Decl.*"), Dkt. 41-1, ¶ 10. Though this difference in description of the April 17, 2017 discussion appears merely to be one of interpretation—of whether Plaintiff *discussed* or *requested* or *demanded* certain drugs—the Court accepts Plaintiff's version of that interaction.

It is undisputed that during the April 17, 2017 appointment, Dr. Haggard explained to Plaintiff that she and other medical staff were "trying to find a reasonable balance of pain control vs. escalating doses of narcotics and addictive drug habits and patterns," in accordance with guidelines on pain management issued by the Centers for Disease Control and Prevention ("CDC Guidelines"). *Ex. A to McMilian Decl.*, Corizon_Weaver 000071. Dr. Haggard wrote in Plaintiff's records that, given "observations and objective data," prescribing narcotics like Methadone or morphine at that time "would be medically inappropriate and against all current evidence-based medical practice and counter to current community standards from" the CDC Guidelines. *Id.*, Corizon_Weaver 000072.

The next day, a different medical staff member, LPN Helen Pierce, examined Plaintiff. Plaintiff complained consistently about pain in his neck and shoulders. However, LPN Pierce noted that Plaintiff "show[ed] no sign of distress," was "able to care for himself and perform multiple [activities of daily living]," and was "sleeping and eating well." *Id.*, Corizon_Weaver 000071.

From April to June 2017, Plaintiff was examined for shoulder pain by Dr. Lawler, "an offsite non-operating orthopedic surgeon," and also saw Dr. Haggard to discuss Dr. Lawler's consultation report. *Haggard Decl.*, ¶ 11. Dr. Lawler and Dr. Haggard agreed

that Plaintiff should be referred for a surgical orthopedic consultation, and Dr. Haggard scheduled that offsite appointment for July 2017. *Id*. Plaintiff later decided that he did not want shoulder surgery while incarcerated but would wait until he was released. *Id*., ¶ 20.

On July 28, 2017, Plaintiff fell from his wheelchair and broke his left femur at the hip. *Compl*., ¶ 20. Plaintiff states that he reported the fall to Nurse Kristina Bower. *Plaintiff's Decl*., ¶ 2(a). However, the fall was not recorded in Plaintiff's medical records, and it appears Nurse Bower did not inform anyone else of the fall. Per the report of LPN John Shaffer, Plaintiff's medical records state that Plaintiff was resting comfortably in bed on July 28, 2017, and that he "denied any wants or needs." *Ex. A to McMilian Decl.*, Corizon_Weaver 000186. Plaintiff may have fallen from this wheelchair after LPN Shaffer's notation. Because Plaintiff's medical records did not include any information that Plaintiff fell from his wheelchair and was injured, Dr. Haggard did not discover the hip/femur fracture until mid-August 2017, after an unrelated CT scan revealed it. *Haggard Decl*., ¶ 12.

Dr. Haggard evaluated Plaintiff for hip/femur pain on August 16, 2017. By this time Dr. Haggard had learned about Plaintiff's fall and asked him about it. Plaintiff told Dr. Haggard that he fell from his wheelchair several weeks earlier while being pushed by another inmate. *Id*. However, Dr. Haggard had heard from other treatment providers that Plaintiff reported different causes of the fall; one provider told Dr. Haggard that Plaintiff said he fell in the shower, and another that Plaintiff said he fell during transport back to his cell several months earlier. *Id*. Plaintiff denies making these other statements, but it remains undisputed that Dr. Haggard was told by other medical staff—and therefore had

reason to believe, whether or not that belief was correct—that Plaintiff had reported different causes of the fall. *Id*. An orthopedic surgeon later determined that Plaintiff's hip/femur fracture was non-operative, and several other specialists declined to take Plaintiff's case. *Corizon Defs' SOF*, ¶¶ 11–14; *Ex. A to McMilian Decl.*, Corizon_Weaver 0001184–1188.

On September 26, 2017, Plaintiff saw Dr. Haggard and told her that he had fallen again and landed badly on his broken femur. After talking with Plaintiff about the long-term use of Norco—the pain medication Plaintiff had been taking—Dr. Haggard changed Plaintiff's pain medication to 10 mg of oxycodone every 6 hours. *Haggard Decl.*, ¶ 16.

Plaintiff's pain did not improve, and on October 3, 2017, Dr. Haggard spoke with Plaintiff about starting him on a longer-acting medication, such as morphine. Plaintiff agreed, and Dr. Haggard prescribed "15 mg of morphine for better pain control" and told Plaintiff to continue the oxycodone "for breakthrough pain (as opposed to around the clock dosing)." *Id.*, ¶ 17. Plaintiff reported in two later examinations that his hip/femur pain had lessened on the new medications. *Id.*, ¶ 18; *Ex. A to McMilian Decl.*, Corizon_Weaver 000115, 121.

Plaintiff saw an offsite provider for shoulder pain in November 2017. The doctor reviewed Plaintiff's MRI, and found that his shoulder tear was more prominent than before, but did not recommend surgery "because most changes [in the shoulder] were degenerative." *Corizon Defs' SOF*, ¶ 19.

Plaintiff complained to Dr. Haggard of hip pain on December 19, 2017 and stated that his hip was "breaking down further." *Id.*, ¶ 20. However, x-rays revealed "no significant change of the femur since September 2017." *Id.*

Dr. Menard began treating Plaintiff in January 2018. *Menard Decl.*, ¶¶ 3, 7. Dr. Menard and Dr. Haggard together evaluated Plaintiff on January 24, 2018. Plaintiff reported "chronic shoulder and hip pain." *Id.*, ¶ 11. Dr. Menard noted that, during Plaintiff's shoulder examination, Plaintiff "was able to move his right arm without grimacing in pain." *Id.* Dr. Menard started Plaintiff on the additional pain medication Lyrica, but advised Plaintiff that he "would continue to review [Plaintiff's] use of opiates as pain medication" in order to "minimize the potential for abuse," given Plaintiff's purported history of substance abuse as documented in the medical records. *Id.*

On the night of February 5, 2018, Nurse Veronica Evancho noted that Plaintiff was asking for oxycodone "every four hours on the dot." *Corizon Defs' SOF*, ¶ 22; *Ex. A to McMilian Decl.*, Corizon_Weaver 000266–267. The next day, Dr. Menard examined Plaintiff, who confirmed that he did not want shoulder surgery until after his release from prison. *Menard Decl.*, ¶ 12.

Two weeks later, on February 20, 2018, Dr. Menard and Dr. Haggard evaluated Plaintiff again. Plaintiff said he was taking two tablets of oxycodone "every 4 hours like clockwork and that Lyrica was no longer working for him." *Id.*, ¶ 13. This statement, added to nursing staff observations that Plaintiff was "waking up in the middle of the night every four hours on the dot" to request oxycodone, concerned the Corizon Defendants. *Id.* Both doctors "discussed with [Plaintiff] his medication and complaints of

pain" and "counseled [Plaintiff] on abusing opiates," but Plaintiff "was very concerned about stopping one of his opiate medications." *Id*. Dr. Menard and Dr. Haggard agreed to taper Plaintiff off of Lyrica and to increase Plaintiff's Baclofen. Plaintiff "continued taking his other pain medications, 10 mg of Oxycodone and 15 mg of extended release Morphine at night." *Id*.

Plaintiff was given new x-rays of his hip and femur on March 21, 2018. *Haggard Decl.*, ¶ 22. Also on that date, Dr. Menard examined Plaintiff and discussed the shoulder injury. *Menard Decl.*, ¶ 14. On March 27, 2018, Dr. Haggard reviewed the x-rays and sent them "to an orthopedic surgeon again to see if they would re-evaluate the possibility of placing a pin or doing something to stabilize the old fracture and minimize the popping." *Haggard Decl.*, ¶ 22.

In April 2018, Plaintiff was caught bartering with another inmate for pain medication. Plaintiff was issued a Disciplinary Offense Report ("DOR") for the violation, was found guilty, and was sentenced to 40 days of segregated status. *Compl.*, ¶¶ 24–25.

Dr. Haggard and Dr. Menard met with Plaintiff on April 24, 2018, to address Plaintiff's pain management regimen. Plaintiff told the Corizon Defendants that "he bought morphine off another inmate" because his pain was not controlled on his then-current medication. *Ex. A to McMilian Decl.*, Corizon_Weaver 000480. Nursing staff had told Dr. Haggard and Dr. Menard that Plaintiff was setting his alarm clock in the middle of the night so he could wake up and take his oxycodone medication. *Haggard Decl.*, ¶ 23; *Menard Decl.*, ¶ 15. Based on these reported demonstrations of what appeared to be

addictive behavior, the Corizon Defendants were concerned that Plaintiff might be abusing his medications. *Id.*

The doctors discussed these addiction concerns with Plaintiff, including the fact that his medical providers "had been relying on [Plaintiff's] own self reporting and giving him the benefit of the doubt that he had pain in his shoulders and hip." *Haggard Decl.*, ¶ 23. They also considered the fact that Plaintiff's medical records did not reflect a report from Plaintiff about any hip/femur pain until after the fracture was discovered through an unrelated CT scan.[2] *Id.*

Dr. Menard recorded in Plaintiff's medical records the following discussion about pain medication:

> I related to [Plaintiff] that I had trusted him and that he broke my trust and that we would have to rebuild that. I explained that not being able to trust a patient makes it difficult to gauge the proper treatment if the source is unreliable. Dr. Haggard and I explained to him that given the lack of objective data to support that he was in pain and [his] dangerous behavior relating to pain medication that we would switch his medication regimen to an extended release pain medication and wean him off his immediate release pain med. We explained that we would continue to monitor his vital signs for any indication of increasing pain. We also expressed our concern for [Plaintiff's] behavior relating to setting an alarm in the middle of the night to get pain medication. We related that with immediate release pain medication that he wouldn't have to be trying to get ahead of the pain. [Plaintiff] started rolling his eyes at us in what appeared to be dismay and then started threatening us with legal action[,] stating that it was inhumane to take away his pain medication. We reassured

---

[2] Plaintiff states that his hip/femur pain came on gradually and that, because of his paraplegia, he does "not necessarily feel pain as an able-bodied person would; Plaintiff explains that these factors are what caused him not to report any such pain before the discovery of the fracture. *Plaintiff's Decl.*, ¶ 13.

> [Plaintiff] that we were [not] taking it away, just changing to
> regimen to ensure his safety and decrease the risk of abuse.

*Ex. A to McMilian Decl.*, Corizon_Weaver 000480.

Dr. Haggard's notes from the evaluation describe the discussion in a similar

manner:

> We have been treating [Plaintiff's] pain based on his self-
> report and giving him the benefit of the doubt that he has pain
> in his shoulder and the hip (although it is unclear what he can
> feel in the hip being a complete paraplegic).
>
> Last year, the patient did NOT report pain and did not even
> report the fall out of his [wheelchair] in the yard[] that
> resulted in the hip fracture, until he was hospitalized for
> another reason and the fracture was found incidentally;
> AFTER WHICH the patient complained of pain.
>
> Unfortunately, the patient has been demonstrating increased
> addictive behavior with setting his alarm clock in the middle
> of the night for OXY dosing and last week bartering for
> another [inmate's] morphine and was caught in the exchange,
> now serving a DOR on [segregated] status in the [infirmary].
>
> Dr. Menard … and I discussed with [Plaintiff] at length this
> morning that because of the addictive pattern developing, we
> will need to taper the long-acting narcotic to the lowest
> effective dose based on objective data such as his vital signs,
> as his self-report can no longer be trusted.

*Id.*, Corizon_Weaver 000482.

Plaintiff asserts that he did not set his alarm clock so that he could take his opiate

medication at night, *Plaintiff's Decl.*, ¶ 11, and the Court accepts this assertion for

purposes of summary judgment. However, it remains undisputed that (1) nursing staff

*reported to the Corizon Defendants* that Plaintiff had been setting his alarm clock to wake

up to take his opiate medication, and (2) Plaintiff's medical records include Nurse

MEMORANDUM DECISION AND ORDER - 17

Evancho's notation that Plaintiff asked for oxycodone at night every four hours on the dot. There is no indication in the record that these nurses were known not to be credible such that the Corizon Defendants might question their reporting. Thus, Dr. Haggard and Dr. Menard had reason to believe that Plaintiff was exhibiting addictive behavior, whether or not he was actually doing so.

Concerned about the potential for opioid abuse, Dr. Haggard and Dr. Menard decided to adjust Plaintiff's pain management therapy. They "developed a very slow taper over the next 7 weeks of [Plaintiff's] immediate release of Oxycodone, while doubling the extended release of Morphine." *Haggard Decl*., ¶ 24.[3] Specifically, the Corizon Defendants' medication adjustment plan called for "decreasing the Oxycodone dosage as follows":

> two … 10mg pills every six hours for one week; two … 10mg pills every eight hours for the second week; one … 10mg pill the first eight hours, two … 10mg pills the second eight hour period, one … 10mg pill the third eight hour period for the third week; one … 10mg pill every eight hours for the fourth week; one … 10 mg pill two times a day for the fifth week; one … 10mg pill in the evening during the sixth week; and one … 5mg pill in the evening during the seventh week.

*Id*. Meanwhile, the dosage of Plaintiff's extended-released morphine would be increased.

---

[3] Dr. Haggard and Dr. Menard "also considered the possibility of administering Methadone," which "does not give a 'high' but controls the pain"; the doctors planned to "circle back" to the possibility of using Methadone depending on how well Plaintiff did on the increased morphine dosage. *Haggard Decl*., ¶ 24. It appears that the Corizon Defendants did not, at that time, communicate to Plaintiff that they were considering Methadone as an option. *Plaintiff's Decl*., ¶ 16 ("In the month of April 2018 and in the months after until October 2018, Drs. Haggard and Menard never offered to change my opiate medication to Methadone. On or about October 10, 2018, was the first time I was offered Methadone.").

MEMORANDUM DECISION AND ORDER - 18

As the Corizon Defendants informed Plaintiff, this medication plan was consistent with Clinical Practice Guidelines of Opiate Therapy for Chronic Pain issued by the Department of Veterans Affairs ("VA Guidelines"). *Menard Decl.*, ¶ 15. The VA Guidelines recommend "ongoing risk mitigation strategies, assessment for opioid use disorder, and consideration for tapering when risks exceed benefits"; the guidelines also suggest "individualize[d] opioid tapering" if, "based on risk assessment and patient needs and characteristics," such tapering is appropriate. *Id.*, ¶ 16. The VA Guidelines indicate that providers should consider "concerns about drug/opioid abuse disorders, the patient's adherence with opioid safety measures, and signs of diversion" in determining whether tapering is appropriate. *Id.* Dr. Menard states that he and Dr. Haggard considered all of these issues when developing Plaintiff's oxycodone-tapering plan. *Id.* The pain management and tapering plan was also consistent with the CDC Guidelines regarding pain management therapy. *Haggard Decl.*, ¶ 25.

Plaintiff does not dispute these particular facts regarding the April 24, 2018 examination and discussion. However, the Complaint alleges the Corizon Defendants also told Plaintiff at that examination that "they would be reducing his pain medication as a result of his possessing a pain pill not prescribed to him." *Compl.*, ¶ 33. Plaintiff interpreted this statement as showing an intent to punish Plaintiff for receiving the bartering DOR. According to Plaintiff, Dr. Menard also said that "Plaintiff's pain meds were … being reduced because the use of opiate pain therapy is currently being discouraged by the federal government." *Id.* Plaintiff interpreted this statement as meaning that it was governmental pressure—and *not* an individualized medical

assessment based on Plaintiff's particular medical needs—that led to the decision to change Plaintiff's pain management regimen. Despite Plaintiff's interpretation of the doctors' statements as meaning they intended to "reduce" his pain medication, the medical records plainly document that while one opioid pain medication was tapered (oxycodone), another was actually *increased* (morphine).

Dr. Menard examined Plaintiff on May 1, 2018, a week after starting the oxycodone taper. Dr. Menard states that Plaintiff was "doing well and his pain was stable." *Menard Decl*., ¶ 17. That same night, RN Jamie Lewis noted that Plaintiff "slept soundly all night" with no signs of distress. *Ex. A to McMilian Decl*., Corizon_Weaver 000475.

On May 15, 2018, both Dr. Menard and Dr. Haggard evaluated Plaintiff. Nursing staff informed them that Plaintiff had been rating his pain at 4 to 6 out of ten, which was lower than it had been. *Id*., Corizon_Weaver 000466–67. Nursing staff also told the doctors that Plaintiff was stable, was sleeping through the night, and was "not outwardly express[ing] any signs of pain." *Id*., Corizon_Weaver 000465. *See also id*., Corizon_Weaver 000467 (notation by Nurse Evancho on May 13, 2018, that Plaintiff rated his pain at 6 and had been "resting all day with no complaints" or "facial grimacing").

On May 21, 2018, Plaintiff rated his pain at 9 out of 10. Plaintiff was "finally starting to be able to move [his] leg," *id*., Corizon_Weaver 000461, which he had not been able to do since he was paralyzed and which might have caused the increase in pain. The next day, Dr. Haggard noted that Plaintiff was able to contract his leg muscles, that

he did not mention any pain, and that nursing staff told her Plaintiff was "tolerating the narcotic wean." *Id*. Dr. Haggard thus concluded that Plaintiff was "tolerating the narcotic taper well." *Haggard Decl*., ¶ 27.

On May 29, 2018, Dr. Haggard and Dr. Menard both treated Plaintiff during their rounds. Plaintiff reported that he "did not like the narcotic taper" and that his left femur caused an unbearable ache, but the doctors again concluded that Plaintiff was, in fact, doing well on the change in medication. *Id*., ¶ 26; *Menard Decl*. ¶ 18; *Ex. A to McMilian Decl*., Corizon_Weaver 000453–455. The Corizon Defendants so concluded because the medical records indicated that Plaintiff was stable, was sleeping through the night, and "was not outwardly expressing any signs of pain." *Haggard Decl*., ¶ 26; *Menard Decl*. ¶ 18.

On June 5, 2018, Plaintiff reported to Dr. Haggard that he was waking up at night due to hip pain. Dr. Haggard placed Plaintiff on Zanaflex, which he had previously taken and which Dr. Haggard believed would help Plaintiff sleep through the night. *Haggard Decl*., ¶ 28.

On June 12, 2018, Dr. Haggard evaluated Plaintiff. Plaintiff told Dr. Haggard that he was "[d]oing okay except [his] 'hip [wa]s driving [him] crazy.'" *Ex. A to McMilian Decl*., Corizon_Weaver 000442. According to the medical records, Plaintiff asked if his pain medications were "where they are," and Dr. Haggard said, "[F]or now, yes." *Id*., Corizon_Weaver 000442–443.

The Complaint describes the June 12, 2018 discussion between Plaintiff and Dr. Haggard differently. Plaintiff alleges that he "asked if he would not be prescribed

additional or more affective [sic] pain medication." *Compl*., ¶ 40. Dr. Haggard allegedly responded, "in effect, 'I'm afraid so,' and then added, 'Don't get any more DORs.'" *Id*.

The Court accepts as true Plaintiff's allegations that, at the June 12 examination, Dr. Haggard (1) told Plaintiff his pain medication would remain as ordered, and (2) also advised Plaintiff to avoid receiving additional DORs. It remains undisputed that, at the time of the June 12 medical evaluation, Plaintiff was, in fact, receiving an increased dosage of morphine as ordered in April 2018. *See Haggard Decl*., ¶ 24.

On June 19, 2018, Dr. Haggard evaluated Plaintiff, noting that Plaintiff again appeared to be doing well and that Plaintiff reported no pain. *Id*., ¶ 30. Dr. Menard also saw Plaintiff on that date, observing that Plaintiff "moved easily in his chair without wincing," that he "could rotate his broken femur with ease and with no sign of discomfort," and that he did not report any pain. *Menard Decl*., ¶ 19.

By July 3, 2018, Plaintiff's oxycodone taper had been completed. Dr. Haggard ordered that Plaintiff's morphine be continued "for the time being." *Haggard Decl*., ¶ 31.

On July 10, 2018, Plaintiff reported that he had twisted his left stump when it caught on his wheelchair, and Dr. Haggard again ordered continuance of Plaintiff's morphine. *Id*., ¶ 32. The following day, Dr. Menard observed that Plaintiff "did not appear to be in any pain and was able to manipulate his leg." *Menard Decl*., ¶ 20.

On July 17, 2018, Dr. Haggard discussed with Plaintiff additional available treatment. After Dr. Haggard told Plaintiff why several outside doctors had rejected Plaintiff's hip fracture as a surgical case, Plaintiff got angry and asked to see a pain specialist. *Haggard Decl*., ¶ 33. Dr. Haggard explained that Plaintiff already "was on

Morphine and other augmenting pain medications and that a pain specialist would not add anything or be able to address the underlying issues." *Id*. Dr. Haggard also discussed increasing Plaintiff's dosage of Neurontin to the maximum amount. Finally, Dr. Haggard decided to explore the use of a custom-designed orthotic device for Plaintiff's hip/femur and scheduled an offsite consultation with Sawtooth Orthotics. *Id*.

One week later, on July 24, 2018, the Corizon Defendants both evaluated Plaintiff and explained that they were still waiting to hear back from the orthotics company. *Menard Decl*., ¶ 21. Plaintiff stated that his shoulder was bothering him and that steroid injections had helped in the past. Dr. Menard agreed that such treatment would be appropriate and would administer the steroid injection at a later date. *Id*.

Plaintiff's consultation with Sawtooth Orthotics occurred on August 9, 2018. The orthotics company agreed to design a brace to stabilize Plaintiff's hip. *Haggard Decl*., ¶ 34. On August 21, 2018, Dr. Menard administered the steroid injection discussed at the July 24 evaluation. *Menard Decl*., ¶ 21.

On October 4, 2018, Plaintiff filed the instant lawsuit, using the Court's prisoner e-filing program. *See* Dkt. 3. On April 15, 2019, the Court reviewed the Complaint and issued its Initial Review Order. That Order notified Defendants of the lawsuit and permitted Defendants to waive service of process. *See* Dkt. 6.

On the morning of October 6, 2018, LPN Joseph Parker examined Plaintiff. LPN Parker noted in Plaintiff's medical records that Plaintiff "ha[d] not expressed any complaint to nursing staff." *Ex. A to McMilian Decl*., Corizon_Weaver 000535. That evening, however, during Plaintiff's evaluation by LPN Tammy McCall, Plaintiff

reported that "his Morphine [wa]s not working for him anymore." *Id.*, Corizon_Weaver 000534–535. The next day, Plaintiff reported to LPN Catherine Fraser that his pain level was a 9 out of 10. *Id.*, Corizon_Weaver 000534.

On October 10, 2018, Dr. Haggard sought out Plaintiff for an evaluation. *Plaintiff's Decl.*, ¶ 14. Plaintiff told her that his pain was never in control and that the morphine was no longer working. *Haggard Decl.*, ¶ 36. Dr. Haggard reviewed Plaintiff's medical records, including the nursing notes. *Id.* Based on that review, Dr. Haggard concluded that Plaintiff "does not demonstrate pain behavior"—the "nursing notes indicate that he watches TV and goes to rec without difficulty" and that Plaintiff's "vital signs have been stable." *Ex. A to McMilian Decl.*, Corizon_Weaver 000533.

However, after a long discussion with Plaintiff, *id.*, Dr. Haggard decided to change Plaintiff's pain medication to Methadone and told Plaintiff Methadone could "help to avoid drug highs," *Haggard Decl.*, ¶ 36. Plaintiff agreed to try the Methadone. Plaintiff understood from Dr. Haggard "that we [would] have to order this new med" and that he would need "to 'hang in there' until we have the new med." *Ex. A to McMilian Decl.*, Corizon_Weaver 000533.

During this October 10 examination, Dr. Haggard allegedly asked Plaintiff, "Had enough?" *Plaintiff's Decl.*, ¶ 14. It is not clear from the record what Dr. Haggard meant by this statement, but Plaintiff believes the statement was "in regard to [his] uncontrolled pain." *Id.*

Dr. Haggard implemented the medication change and started Plaintiff on Methadone. *Haggard Decl.*, ¶ 37. After switching to Methadone, Plaintiff consistently reported less pain and was sleeping better. *Id.*, ¶¶ 38–41.

Plaintiff received his orthotic hip brace at some point in October 2018. *Id.*, ¶ 40. Dr. Haggard believed that the hip brace was improving Plaintiff's pain, but, in May 2019, Plaintiff told her he had stopped wearing his brace. *Id.*, ¶¶ 40–41. Plaintiff stopped wearing it, evidently, because the brace did not alleviate Plaintiff's pain or "keep the hip fracture from jarring when [Plaintiff] transferred" to and from his wheelchair. *Plaintiff's Decl.*, ¶ 21. At this same May 2019 examination, however, Plaintiff again confirmed that "his pain was stable on the Methadone." *Haggard Decl.*, ¶ 41.

Plaintiff does not specifically dispute the medical records' description of each of his medical examinations from April to October 2018. Instead, Plaintiff asserts generally that he was "constantly" giving "overt signs that [he] was in pain, including grunting or holding [his] breath …, anxiety, shifting in discomfort constantly, waking frequently at night, and being less active." *Plaintiff's Decl.*, ¶¶ 19–20. Plaintiff also states that "[a]t no time" from the start of the oxycodone taper until October 2018 did he tell anyone that his pain was decreasing. *Id.*, ¶ 23. Plaintiff asserts that his normal vital signs throughout this period were not reliable indicators of pain levels, because he has "suffered chronic pain for years and [is] accustomed to living with pain and because [he] was on blood-pressure medication." *Id.*, ¶ 12.

Plaintiff has also submitted the affidavits of two other inmates, Jacob Tyler Anderson and David Meister. These affidavits state that (1) Plaintiff appeared to be in

pain during the relevant period and exhibited outward signs of such pain, (2) medical staff appeared to ignore Plaintiff's reported pain levels, and (3) Plaintiff's pain appeared to be better controlled after he started taking Methadone. *Aff. of Jacob Tyler Anderson*, Dkt. 41-1 at 26–27; *Aff. of David Meister*, Dkt. 41-1 at 30–31, ¶¶ 3–8. It does not appear that either inmate has medical training.

Notwithstanding Plaintiff's and the other inmates' statements, information in Plaintiff's medical records during this period indicated—and nursing staff directly reported to the Corizon Defendants—that Plaintiff's pain was stable, that Plaintiff was sleeping through the night, and that he was not outwardly expressing signs of pain, whether or not that information was correct. It is undisputed that the Corizon Defendants reviewed this information in the medical records—again, whether or not it was correct— when determining that the oxycodone taper and increased morphine dosage remained medically appropriate from April to October 2018.

**2.      Plaintiff's Administrative Grievance and Defendant Siegert's Response**

When an Idaho prisoner files a grievance on a medical issue, the first two individuals who respond to the grievance are referred to as the Level 1 and Level 2 responders. These individuals are "administrative and/or medical professionals employed by Corizon." *Affidavit of Rona Siegert* ("*Siegert Aff.*"), Dkt. 36-3, ¶ 3. If an inmate is not satisfied with the response to the grievance as provided by the Level 1 and 2 responders, the inmate may file an appeal. The Level 3 appellate authority then reviews the grievance appeal. *Id.*, ¶¶ 2–3. Defendant Rona Siegert is the Level 3 appellate authority.

In her role as the Level 3 appellate authority, Defendant Siegert reviews the grieving inmate's medical records and the response from the Level 1 and Level 2 responders. If Defendant Siegert has questions or concerns after this review, she communicates with medical staff or the Corizon Regional Medical Director. If she is still concerned after such a consultation, Defendant Siegert brings those concerns to the attention of her supervisor. *Id.*, ¶ 2. Defendant Siegert does not provide medical treatment to inmates. *Id.*

On June 14, 2018—during the oxycodone taper—Plaintiff filed a grievance relating to his pain treatment. *Id.*, ¶ 4; *Ex. A to Siegert Aff.*, p. 1. The grievance provided:

> Pain increasing daily, while my painmeds are being reduced daily. I have a broken femur that no surgeon supposedly will fix. Jacked up shoulder, and something wrong with my abdomen. You have seriously reduced my pain meds because of bad press, not for medical reasons, and haven't fixed the problem[.]

*Id.*

The Level 1 responder stated that "IDOC and Corizon have adopted the Veterans Affairs guidelines for managing chronic opioid use" and noted that Plaintiff was already taking both morphine and Neurontin for pain. *Id.* The Level 2 responder agreed with the Level 1 responder and denied the grievance:

> A review of your chart reveals that you are on pain therapy that continues to be monitored by Long Term Care nursing and our Site Medical Director, Dr. Haggard[,] and Regional Medical Director, Dr. Menard. Nursing staff have charted appropriate vital signs and levels of activity that are not indicative of increased pain. However, please continue to address your pain therapy or any concerns you may have with our medical staff as needed, during their rounds.

*Id.*, p. 2.

Plaintiff appealed the denial of his grievance, asserting the following:

> I'm in more pain at times now than when I started this process on 5/4. First reason is, I'm not asking to be treated for cronic [sic] opioid use, I'm asking for pain relief from a broken hip that is constantly grining [sic] and throbbing-second, before being prescribed Norvasc[,] a blood pressure med[,] my blood pressure was alarmingly high. My past vitals will prove that. I have been in constant pain for so long my blood pressure won't be indicative of increased pain. The reasons even for changing my pain meds are proven to be false, just last week I asked Dr. Haggard it I was maxed out on pain meds and she told me I'm afraid so, don't get anymore [sic] D.O.R.s. Bad press and D.O.R.s aren't medical reasons. I simply want to have pain relief and I'd like monetary compensation for the cruel and unusual punishment I feel has been given to me.

*Id.*

In investigating Plaintiff's grievance regarding his pain management therapy, Defendant Siegert reviewed Plaintiff's medical records from March 13, 2018, through July 2, 2018 (the date she wrote her response to Plaintiff's grievance appeal). Those records revealed the following:

- During the month of April 2018, Plaintiff "was seen and treated by the medical staff on 21 separate occasions relating to numerous medical issues and complaints.… [D]uring this time, [Plaintiff] was receiving narcotic pain medications prescribed by his treating physicians. Additionally, medical staff had requested an orthopedic consult with an off-site physician."

- In May 2018, Plaintiff "was seen and treated by medical staff at the infirmary on 23 separate occasions for multiple medical issues and complaints." Plaintiff "continued to receive narcotic pain medications as prescribed by his treating physicians."

- In June 2018, Plaintiff was "seen and treated by medical staff … on 26 different occasions…. During the month, [Plaintiff] was advised an off-site orthopedic doctor had agreed to review his records and, would schedule a physical examination if needed. Additionally, [Plaintiff's medical records documented he continued to receive narcotic pain medications as prescribed by his treating physicians."

*Siegert Aff.*, ¶¶ 11–13. From this review of Plaintiff's medical records, Defendant Siegert concluded that Plaintiff's ongoing course of treatment was responsive and medically appropriate: Plaintiff "was able to access medical care," his treating providers were "consistently responding to and treating his complaints," and he "was receiving appropriate care." *Id.*, ¶ 15.

Defendant Siegert denied Plaintiff's grievance appeal:

> I am sorry that you are not liking the changes to your pain control treatment plan. A review of your medical record shows you continue to receive Morphine 15 mg. three times a day as well as Gabapentin at a max dose of 3600 mg. per day. On 6/12/2018 when Dr. Haggard saw you she informed you that ortho has agreed to review your records and discuss possible options for your fractured femur. Also, at the 6/12 encounter you asked Dr. Haggard if your pain meds are "where they are" and she replied "yes, for now". The opioid issue is not simply "bad press[.]" [I]t is a very real epidemic and it's prudent for medical providers to be looking at their patients use [sic] of these medications and the decisions being made in your case do not have anything to do with your DOR. At this time you are continuing to be managed on Morphine and Gabapentin. Please discuss any further questions or concerns with Dr. Haggard at her weekly long term care rounds.

*Ex. A to Siegert Aff.*, p.2. With this response, the administrative grievance process was concluded.

## DISCUSSION

**1.     Standards of Law Applicable to Plaintiff's Claims**

Plaintiff brings his claims under 42 U.S.C. § 1983, the civil rights statute. To prevail on a civil rights claim, a plaintiff must show a violation of rights protected by the Constitution or created by federal statute proximately caused by conduct of a person acting under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). To be held liable under § 1983, "the defendant must possess a purposeful, a knowing, or possibly a reckless state of mind." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472 (2015). Negligence is not actionable under § 1983, because a negligent act by a public official is not an abuse of governmental power but merely a "failure to measure up to the conduct of a reasonable person." *Daniels v. Williams*, 474 U.S. 327, 332 (1986).

Prison officials and prison medical providers generally are not liable for damages in their individual capacities under § 1983 unless they personally participated in the alleged constitutional violations. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *see also Iqbal*, 556 U.S. at 677 ("[E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct."). Section 1983 does not allow for recovery against an employer or principal simply because an employee or agent committed misconduct. *Taylor*, 880 F.2d at 1045.

However, "[a] defendant may be held liable as a supervisor under § 1983 'if there exists ... a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)). A plaintiff can establish this causal

connection by showing that a defendant (1) set in motion a series of acts by others that violated the Constitution, or knowingly refused to terminate a series of such acts, which the supervisor "knew or reasonably should have known would cause others to inflict a constitutional injury"; (2) knowingly failed to act or acted improperly "in the training, supervision, or control of his subordinates"; (3) acquiesced in the constitutional deprivation; or (4) engaged in "conduct that showed a reckless or callous indifference to the rights of others." *Id.* at 1205–09 (internal quotation marks omitted).

The Eighth Amendment to the United States Constitution protects prisoners against cruel and unusual punishment. To prevail on an Eighth Amendment claim, a prisoner must establish that he is "incarcerated under conditions posing a substantial risk of serious harm," or that he has been deprived of "the minimal civilized measure of life's necessities" as a result of the defendants' action or inaction. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). An Eighth Amendment claim requires the plaintiff to satisfy both (1) an objective standard, "that the deprivation was serious enough to constitute cruel and unusual punishment," and (2) a subjective standard, that the defendant acted with "deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014) (en banc).

The Eighth Amendment includes the right to adequate medical treatment in prison. Prison officials or prison medical providers violate the Eighth Amendment if their "acts or omissions [were] sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

Regarding the objective standard for prisoners' medical care claims, "society does not expect that prisoners will have unqualified access to health care." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). Therefore, "deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id*. The Ninth Circuit has defined a "serious medical need" in the following ways:

> failure to treat a prisoner's condition [that] could result in further significant injury or the unnecessary and wanton infliction of pain[;] ... [t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain ....

*McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir. 1992) (internal citations omitted), *overruled on other grounds*, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).

As to the subjective standard, "deliberate indifference entails something more than mere negligence, [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. A prison official or prison medical provider acts with deliberate indifference "only if the [official or provider] knows of and disregards an excessive risk to inmate health and safety." *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002) (internal quotation marks omitted), *overruled on other grounds by Castro v. Cty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (en banc). "Under this standard, the prison official must not only 'be aware of facts from which the inference could be drawn that a substantial

risk of serious harm exists,' but that person 'must also draw the inference.'" *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (quoting *Farmer*, 511 U.S. at 837).

In the medical context, deliberate indifference can be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104-05 (footnotes omitted). Medical malpractice does not support a cause of action under the Eighth Amendment, *Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (per curiam), and a delay in medical treatment does not violate the Eighth Amendment unless that delay causes further harm, *McGuckin*, 974 F.2d at 1060.

"If a [prison official] should have been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no matter how severe the risk." *Gibson*, 290 F.3d at 1188. Moreover, even prison officials or medical providers who *did* know of a substantial risk to an inmate's health will not be liable under § 1983 "if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. If medical personnel have been "consistently responsive to [the inmate's] medical needs," and the plaintiff has not shown that the medical personnel had "subjective knowledge and conscious disregard of a substantial risk of serious injury," there has been no Eighth Amendment violation. *Toguchi*, 391 F.3d at 1061.

"There is not one proper way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008) (internal quotation marks omitted). Accordingly,

differences in judgment as to appropriate medical diagnosis and treatment are not enough to establish a deliberate indifference claim. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).

"[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk' to the prisoner's health." *Toguchi*, 391 F.3d at 1058 (alteration omitted) (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)). Stated another way, a plaintiff must prove that medical providers chose one treatment over the plaintiff's preferred treatment "even though they knew [the plaintiff's preferred treatment] to be medically necessary based on [the plaintiff's] records and prevailing medical standards." *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1117 (N.D. Cal. 2015). To violate the Eighth Amendment, the choice of treatment must have been "so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances." *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 989 (7th Cir. 1998); *see also Lamb v. Norwood*, 895 F.3d 756, 760 (10th Cir. 2018) ("[P]rison officials do not act with deliberate indifference when they provide medical treatment even if it is subpar or different from what the inmate wants.").

A court's review of a prison medical provider's choice of treatment must be especially deferential where the issue is pain medication for an incarcerated substance abuser. In such cases, the court "is asked to pass judgment on the attempts by prison medical staff to navigate between" the risk of debilitating pain versus the competing risk

of addiction. *Baker v. Stevenson*, 605 F. App'x 514, 519 (6th Cir. 2015) (unpublished).

Where a prison medical provider believes in good faith that a certain course of pain

treatment might "create or enable" a risk of addiction, the provider's decision not to

provide that treatment "cannot be considered an act of deliberate indifference." *Id*. The

Constitution "does not impose a constitutional obligation upon prison officials" or prison

medical providers "to enable a prisoner's substance abuse or addiction problem." *Id*. at

518.

      The Eighth Amendment requires that prison medical providers exercise informed

medical judgment. Thus, if a medical treatment is denied because of a blanket

governmental policy—rather than an individualized determination of the appropriate

treatment for the particular inmate—a factfinder may infer deliberate indifference. *See

Rosati v. Igbinoso*, 791 F.3d 1037, 1039–40 (9th Cir. 2015) ("Rosati plausibly alleges

that prison officials were aware of her medical history and need for treatment, but denied

the surgery because of a blanket policy against [sex reassignment surgery]."); *Allard v.

Gomez*, 9 F. App'x 793, 795 (9th Cir. 2001) (unpublished) ("[T]here are at least triable

issues as to whether hormone therapy was denied ... on the basis of an individualized

medical evaluation or as a result of a blanket rule, the application of which constituted

deliberate indifference to [plaintiff's] medical needs.").

      However, if providers make an individualized assessment and choose a treatment

that, in their informed judgment, is medically appropriate, a plaintiff generally cannot

establish deliberate indifference. *See Lamb*, 895 F.3d at 760 ("[The plaintiff] is obtaining

psychological counseling and hormone treatments, including estrogen and testosterone-

blocking medication. Though prison officials have not authorized surgery or the hormone dosages that [the plaintiff] wants, the existing treatment precludes a reasonable fact-finder from inferring deliberate indifference."); *Supre v. Ricketts*, 792 F.2d 958, 963 (10th Cir. 1986) ("While the medical community may disagree among themselves as to the best form of treatment for plaintiff's condition, the Department of Corrections made an informed judgment as to the appropriate form of treatment and did not deliberately ignore plaintiff's medical needs."). In such a case, a plaintiff may avoid summary judgment on an Eighth Amendment claim only if the defendants intentionally interfered with appropriate medical diagnosis and treatment—for example, by "creat[ing] a pretextual report to support denial" of a requested treatment. *Norsworthy*, 87 F. Supp. 3d at 1117.

Administrative or supervisory defendants who were involved in reviewing claims in an administrative grievance process might or might not be liable for the constitutional violations complained of in those grievances, depending upon (1) the type and timing of problem complained of, and (2) the role of the defendant in the process. For example, an appeals coordinator cannot cause or contribute to a completed constitutional violation, which occurred in the past and which is not remediable by any action the reviewer might take. *See, e.g., George v. Smith*, 507 F.3d 605, 609–610 (7th Cir. 2007) ("A guard who stands and watches while another guard beats a prisoner violates the Constitution; a guard who rejects an administrative complaint about a completed act of misconduct does not."). A defendant whose only role in a completed constitutional violation involved the denial

of a grievance "cannot be liable under § 1983." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999).

If, however, the administrative or supervisory defendant "knew of an ongoing constitutional violation and … had the authority and opportunity to prevent the ongoing violation," yet failed to act to remedy the violation, then the defendant may be held liable under § 1983. *Herrera v. Hall*, 2010 WL 2791586 at *4 (E.D. Cal. July 14, 2010) (unpublished) (citing *Taylor*, 880 F.2d at 1045), *report and recomm'n adopted*, 2010 WL 3430412 (E.D. Cal. Aug. 30, 2010). Where claims are asserted against persons who supervise the provision of prison medical care, the question at summary judgment is not whether the supervisor was "directly involved" in the plaintiff's treatment. *Gonzalez v. Ahmed*, 67 F. Supp. 3d 1145, 1156 (N.D. Cal. 2014). Instead, the question is whether the plaintiff has provided evidence from which a jury could find that the supervisor's "knowing failure to address" the treating provider's deficient care interfered with the plaintiff's medical treatment. *Id*.

## 2.    The Corizon Defendants Are Entitled to Summary Judgment

Dr. Haggard and Dr. Menard assert that, under the subjective prong of the Eighth Amendment test, their decision to increase Plaintiff's morphine while decreasing his oxycodone was not the result of deliberate indifference.[4] Instead, that decision was based on their medical training and their independent medical judgment, taking into consideration Plaintiff's individualized medical needs, his apparently addictive behavior

---

[4] Defendants do not dispute that Plaintiff's chronic pain is a serious medical need that satisfies the objective prong of the Eighth Amendment test.

and history of substance abuse, and the CDC and VA Guidelines. The evidence proffered by the Corizon Defendants fully supports this assertion.

As easily seen from the facts set forth above, the Corizon Defendants treated Plaintiff for his chronic pain frequently and regularly. They attempted different pain medications at different times, trying to find the appropriate drugs and the appropriate dosages for an inmate with a documented history of substance abuse. The Corizon Defendants relied on information they received from other medical staff that, if true, showed Plaintiff was exhibiting addictive behavior—bartering with another inmate for extra pain medication and setting his alarm clock in the middle of the night to take his opioid medication every four hours on the dot. In an attempt to strike a balance between managing Plaintiff's pain and lowering the risk of dependency and addiction, the Corizon Defendants reasonably decided to taper off Plaintiff's oxycodone and to increase his morphine. After it appeared that Plaintiff's pain was not improving, they decided to switch Plaintiff to Methadone. There was nothing deliberately indifferent about that course of treatment.

This case is similar to *Garcia v. Riaz*, Case No. 2:15-CV-1869JAMDMCP, 2019 WL 415043, at *5 (E.D. Cal. Feb. 1, 2019) (unpublished), in which the district court considered a prison medical provider's choice to provide non-opioid pain medications instead of opioid medications. In deciding to prescribe non-opioids, the provider considered and accounted for (1) the plaintiff's medical evaluations, other medical conditions, and the observations of other medical staff, (2) the plaintiff's "long history of use of opioid medications for chronic pain," (3) evidence that the plaintiff "engaged in

medication-seeking behavior," (4) "the risks of dependence associated with long-term opioid use," and (5) "the availability of non-narcotic alternative medications for plaintiff's pain." *Id.*, at *5. Based on this evidence, the court concluded that the provider did not act with deliberate indifference.

Plaintiff's case is also comparable to the Sixth Circuit's decision in *Baker v. Stevenson*, 605 F. App'x 514. There, a prison medical provider chose not to prescribe narcotic pain medication where the plaintiff's subjective complaints of pain were inconsistent with objective findings. Medical staff had "suspicions of possible drug-seeking behavior and exaggeration of subjective pain," and the plaintiff was seen moving without difficulty when he did not know he was being observed. *Id.* at 517. Further, like Plaintiff in this case, the inmate in *Baker* had been caught with unprescribed narcotics, causing medical providers to suspect addictive behavior. *Id.* Considering all of these factors, the Sixth Circuit held that the decision on how to treat the inmate's pain was not deliberately indifferent.

Here, Dr. Haggard and Dr. Menard considered the same types of factors in deciding to change Plaintiff's pain medication in April 2018 and to continue that regimen until it became clear that another medication would be better for him. The Corizon Defendants relied on information in the medical records suggesting that Plaintiff's pain was not fully consistent with objective indicators. They were also concerned about Plaintiff's apparently addictive behavior and exercised their independent judgment in coming up with the new treatment plan.

MEMORANDUM DECISION AND ORDER - 39

Using such informed medical judgment is the *opposite* of deliberate indifference. *See Lockett v. Bonson*, 937 F.3d 1016, 1024 (7th Cir. 2019) (no deliberate indifference in choosing to prescribe a drug other than oxycodone, where provider "employed professional judgment" in choosing that treatment). Indeed, "[e]fforts to wean a prisoner off opiate or narcotic pain medication to which he has become addicted are not an unconstitutional form of punishment but a medical judgment that the long-term harms of addiction and abuse outweigh the short-term benefits of reduced subjective pain." *Baker*, 605 F. App'x at 519.

That Plaintiff's pain ultimately was better controlled with Methadone than with morphine does not support a reasonable inference that no minimally competent medical provider would have treated Plaintiff as the Corizon Defendants did. It is not deliberately indifferent to try a certain treatment and then to change that treatment once it is determined to be ineffective. The Corizon Defendants have met their initial burden of showing that Plaintiff's pain treatment from April to October 2018 was medically appropriate, that they responded reasonably to Plaintiff's pain and did not consciously disregard an excessive risk, and that—therefore—they were not deliberately indifferent to Plaintiff's serious medical needs. *See Farmer*, 511 U.S. at 844; *Toguchi*, 391 F.3d at 1058.

The burden thus shifts to Plaintiff to establish a genuine and material factual dispute with respect to the Corizon Defendants' decision on the pain management regimen from April to October 2018. Plaintiff has failed to do so.

MEMORANDUM DECISION AND ORDER - 40

To support his claim that the Corizon Defendants acted with deliberate indifference, Plaintiff first points to various statements allegedly made by the Corizon Defendants. On April 24, 2018, Dr. Haggard and Dr. Menard allegedly told Plaintiff that "they would be reducing his pain medication as a result of his possessing a pain pill not prescribed to him." *Compl.*, ¶ 33. At the June 12, 2018 medical evaluation, Plaintiff asked whether his pain medication would remain the same, and Dr. Haggard allegedly said, "I'm afraid so," followed by the statement, "Don't get any more DORs." *Id.*, ¶ 40. And on October 10, 2018, Dr. Haggard allegedly asked Plaintiff's whether he had "had enough." *Plaintiff's Decl.*, ¶ 14.

Plaintiff interprets these statements as expressing an intent to punish Plaintiff, for having another inmate's pain medication, by tapering Plaintiff's oxycodone. However, that interpretation is unreasonable.

It is not reasonable to infer from the above statements that the doctors intended to increase Plaintiff's pain as punishment for a disciplinary violation. As an initial matter, Dr. Haggard's advice that Plaintiff should not engage in disciplinary violations and her "had enough" question are simply too vague to support an inference that the Corizon Defendants withheld adequate pain therapy to punish Plaintiff, rather than choosing Plaintiff's pain management treatment after consideration of all appropriate factors and in an exercise of professional medical judgment. Plaintiff's subjective belief as to what these statements meant is insufficient to create a material factual dispute.

As for the statement that the impetus behind the medication change was the bartering charge, the Corizon Defendants acknowledge that Plaintiff's behavior in

MEMORANDUM DECISION AND ORDER - 41

seeking unprescribed pain medication was a factor in the medication change. But the

record plainly shows that the medication change was *not* intended to punish Plaintiff.

Instead, the Corizon Defendants considered Plaintiff's bartering to be *evidence of*

*addictive behavior*—behavior which they were obliged to take seriously, given Plaintiff's

documented history of substance abuse and the serious risk of opioid addiction. As the

Ninth Circuit has previously recognized, there is "an epic crisis of deadly opioid abuse

and overuse" in this country:

> In 2016, roughly 11.5 million people in the United States
> misused prescription opioids. U.S. Dep't of Health and
> Human Services, *About the U.S. Opioid Epidemic* (2018),
> https://www.hhs.gov/opioids/about-the-epidemic/ (last visited
> March 8, 2018). That same year, 116 people on average died
> every day from opioid-related drug overdoses. *Id.* And in
> 2017, the Acting Secretary of Health and Human Services
> declared the national opioid abuse epidemic a public health
> emergency. U.S. Dep't of Health and Human Services, *HHS*
> *Acting Secretary Declares Public Health Emergency to*
> *Address National Opioid Crisis* (2017),
> https://www.hhs.gov/about/news/2017/10/26/hhs-acting-
> secretary-declares-public-health-emergency-address-national-
> opioid-crisis.html (last visited March 8, 2018).

*United States v. Garrison*, 888 F.3d 1057, 1059 (9th Cir. 2018).

The undisputed evidence in the record establishes that the Corizon Defendants

believed Plaintiff was bartering for pain medication and setting his alarm so that he could

wake up to take his medication. The evidence also establishes that the Corizon

Defendants believed this behavior showed a tendency toward addiction. Further, the

doctors did not, in fact, "reduce" Plaintiff's pain medication. Instead, they tapered (and

eventually eliminated) one medication while increasing another. Given the serious opioid

crisis in this country, Plaintiff has not raised a genuine dispute that the doctors' April 2018 change in pain treatment was a medically appropriate attempt to balance the risk of addiction with Plaintiff's need for pain medication.

Plaintiff also relies on Dr. Menard's April 2018 statement that he was changing Plaintiff's medication "because the use of opiate pain therapy is currently being discouraged by the federal government." *Compl.*, ¶ 33. Plaintiff interprets this statement to mean that Dr. Menard considered *only* this supposed federal discouragement, and that he did not consider Plaintiff's individualized medical needs when instituting the medication change.

Once again, however, Plaintiff's interpretation of this statement is unreasonable in light of the undisputed facts. The Corizon Defendants did, of course, consider the federal guidelines on pain management as set forth by the CDC and the VA. But the doctors did not rely *solely* on those guidelines; rather, they considered the federal guidelines in conjunction with Plaintiff's individualized medical needs.

The evidence shows that the Corizon Defendants were trying to manage Plaintiff's pain while, at the same time, lowering the risk of substance abuse—a risk that appeared substantial, as evidenced by Plaintiff's documented bartering for pain medication and setting his alarm clock in the middle of the night. Whether or not Plaintiff actually engaged in this addictive behavior is beside the point. It remains undisputed that, based on the reports of nursing staff, the Corizon Defendants *subjectively believed* that Plaintiff was showing addictive behavior. Dr. Menard's statement regarding discouragement of

opioid use by the federal government does not create a genuine dispute of material fact sufficient to overcome this evidence.

Plaintiff also relies on the timing of the instant lawsuit and the October 2018 change of medication. Plaintiff contends that the Corizon Defendants started him on Methadone, after he filed this action, only to avoid liability for a § 1983 violation. That is, Plaintiff contends that the Corizon Defendants eventually prescribed Methadone because they had already known, throughout the treatment period from April to October 2018, that his medical treatment was constitutionally inadequate. However, Plaintiff has not supported this contention with any evidence.

It is true that Plaintiff filed this lawsuit on October 4, 2018. It is also true that the Corizon Defendants changed Plaintiff's pain medication to Methadone less than a week later, on October 10, 2018. But Plaintiff has failed to provide any evidence as to how the Corizon Defendants were even aware of this lawsuit at the time they decided to place Plaintiff on Methadone. This Court did not notify the Corizon Defendants of the lawsuit until *April 15, 2019*, when it issued its Initial Review Order.

The Court has considered the fact that Plaintiff would have needed to provide his Complaint to an IDOC employee so it could be filed in this Court. Thus, it is possible that some unidentified person working for the IDOC knew about Plaintiff's lawsuit before the Methadone change. But Dr. Haggard and Dr. Menard are *not* IDOC employees. They are medical providers working for Corizon. There is simply no evidence that the Corizon Defendants knew about Plaintiff's lawsuit before the Methadone switch and, therefore,

MEMORANDUM DECISION AND ORDER - 44

no evidence from which to infer that the medication change occurred because the Corizon
Defendants wanted to avoid liability for a known constitutional violation.

Plaintiff has not met his burden of showing a genuine dispute as to any material
fact. Rather, the evidence shows that the Corizon Defendants responded reasonably to
Plaintiff's pain, especially considering his apparently addictive behavior and his history
of substance abuse. Dr. Haggard and Dr. Menard have shown that they did not act with
deliberate indifference and, therefore, did not violate the Eighth Amendment.
Accordingly, the Corizon Defendants are entitled to summary judgment.

### 3.     Defendant Siegert Is Entitled to Summary Judgment

Establishing that Defendant Siegert committed a constitutional violation depends
on establishing that Plaintiff's treating medical providers committed a constitutional
violation. *See Starr*, 652 F.3d at 1207 (holding that liability of a supervisor requires a
causal connection between the supervisor's misconduct and the constitutional violation
committed by the subordinate); *see also Patrick v. Rivera*, No. 2:11-CV-00113-EJL,
2013 WL 2945118, at *11 (D. Idaho June 13, 2013) ("Where, as here, there is no
constitutional violation by the officers, there can be no municipal liability."); *City of Los
Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional
injury at the hands of the individual police officer, the fact that the departmental
regulations might have *authorized* the use of constitutionally excessive force is quite
beside the point."). Because the Corizon Defendants have shown that Plaintiff cannot
establish an Eighth Amendment violation based on their chosen treatment, Plaintiff also
cannot establish such a violation based on Defendant Siegert's review of that treatment.

## CONCLUSION

For the foregoing reasons, the Court concludes that there is no genuine dispute of material fact and that all Defendants are entitled to judgment as a matter of law on Plaintiff's Eighth Amendment claims.

## ORDER

**IT IS ORDERED** that the Corizon Defendants' Motion for Summary Judgment and Defendant Siegert's Motion for Summary Judgment (Dkts. 36 and 38) are GRANTED.

DATED: February 1, 2021

B. Lynn Winmill
U.S. District Court Judge